HILAM, INC., Plaintiff and Respondent, vs. PETERSEN OIL COMPANY, INC., and others, Defendants and Respondents: THE STATE, Appellant.

*December 6, 1934—January 8, 1935.*

For the appellant there were briefs by the *Attorney General* and *Warren H. Resh* and *Herbert H. Naujoks,* assistant attorneys general, and oral argument by *Mr. Resh, Mr. Fred W. Armstrong,* assistant attorney general, and *Mr. Naujoks.*

*William E. Burke* of Milwaukee, for the respondent Petersen Oil Company, Inc.

*Omar T. McMahon* of Milwaukee, for the respondent L. Soergel & Sons Company.

*August C. Moeller* and *Benjamin Poss,* both of Milwaukee, for the respondents Rediske.

NELSON, J. The principal question argued upon this appeal and, in our view, the sole question to be determined, is whether the trial court erred in holding that the state of Wisconsin was not entitled to a lien upon the premises of the Petersen Oil Company.

There is no material dispute as to the facts. On and before July 1, 1931, the Petersen Oil Company (hereafter called the company), owned about eight acres of land situated on the north side of the Blue Mound road in Waukesha county. There existed upon this land a filling station and a number of large storage tanks. The company operated both the filling station and the bulk gasoline plant. It also operated two other filling stations as lessee thereof.

The company's shareholders were Andrew B. Petersen, who held eighty-nine shares, Edward R. Petersen, who held one share, and Louise Petersen, who held ten shares.

On or about July 1, 1931, the company began to erect upon its real estate a recreation building or roadhouse, the building of which gave rise to the several claims for lien.

In September, 1931, the company entered into a so-called joint adventure agreement with the Rediskes. It was recited therein that the parties thereto deemed it an advantageous time to purchase and store gasoline. The Rediskes agreed to advance $25,000 to the company for the purchase of gasoline. The company agreed to use diligence in purchasing gasoline, to store it, and to conduct the business of selling it. The company guaranteed a net profit of $3,000 to the Rediskes, which it was agreed, was to be paid to them out of the first profits to arise from the venture. The company agreed to make, execute, and deliver to the Rediskes its note for $28,000, secured by a mortgage upon its Blue Mound property. The agreement further provided that if the company failed to sell sufficient gasoline to repay the Rediskes within one year, then at the election of the Rediskes, the exclusive management and control of the joint adventure might be taken over by them; they to have the right to sell gasoline when and as they deemed wise and expedient, and from the profits of such sales to repay to themselves such sums of money as had not been paid prior to one year from the date of the contract, together with the $3,000 guaranteed profit. The agreement further provided that in the event the Rediskes took over the operation of the joint adventure they would be entitled to receive, out of the profits of the sale of gasoline, reasonable compensation for their trouble in managing and controlling the business. It was further agreed that the company would turn over to the Rediskes all of the books, records, and statements relating to the said business. Pursuant to that agreement the Rediskes advanced to the company $25,000 as agreed. A large part, if not all, of the

$25,000, was evidently used for purposes other than the purchase of gasoline. At the end of the year the company was hopelessly in debt. It had failed to pay to the state of Wisconsin gasoline taxes aggregating the sum of about $7,000 which it was obligated to pay as a duly licensed dealer. The state instituted an action against the company, and a receiver of the company's property was appointed. In that situation the company was unable to procure a license from the state treasurer for the year 1932. The company was "broke" and consequently had no way of financing the purchase of gasoline. The Rediskes were, of course, interested in having the Blue Mound station kept open and its good-will preserved. It was apparently agreed by all the parties concerned that their interests would be best subserved by leasing the property to Andrew B. Petersen, individually, in case he could obtain a dealer's license from the state treasurer. He went to Madison and applied for a license in his own name. The state treasurer granted him a license. The company thereafter duly leased the Blue Mound property to him for a rental of $250 a month. He was without funds to conduct the stations. The Rediskes agreed to finance him upon condition that he would permit one of their employees to supervise his accounts, to take charge of moneys received, and to pay his bills for rent, gasoline, taxes, etc. This was agreeable to Petersen. Petersen had complete charge of the station, except as to its supervised finances. This arrangement continued until about September 1, 1932, when Petersen became dissatisfied with the arrangement and evidently believed that he could get along without the help of the Rediskes.

Some time after May or June, 1932, the claim of the state against the company was fully adjusted and the receiver of the company discharged. The Rediskes loaned the company $5,750, which was sufficient to settle the claim of the state and to pay a bill owing its attorneys. A second mortgage was given to the Rediskes to secure that loan.

In January, 1933, the licenses of the stations operated by Petersen were renewed upon his application in the name of Andrew B. Petersen Oil Company. There was no such company but Petersen did business under that name in 1933. Thereafter Petersen failed, as licensee, to pay the state of Wisconsin $305.22, which became due for sales of gasoline in March, 1933, $5,780.96 for April sales; $6,001.12 for May sales; $305.20 for excessive shrinkage claimed and deducted from January 1st to December 21, 1932, and $1,303.92 for excessive shrinkage from January 1st to March 1, 1933. The license of Andrew B. Petersen was thereafter revoked and the station leased to a stranger.

The court found the facts substantially as stated and that the amount claimed by the state was not a proper charge against the company; that Andrew B. Petersen was not the owner of the above-described premises and had no interest in the title thereto except as a lessee thereof; that the amount of the gasoline tax arrearages was not owing by the company; and that the state of Wisconsin had no lien upon or any right, title, or interest in the premises described in the findings.

The court concluded that:

"The interpleaded defendant, the state of Wisconsin, has no lien against or upon and no right, title or interest of any kind or nature in or to any of the premises hereinbefore described."

The findings of fact are sustained by the evidence and the conclusion of law is obviously supported by them.

The state, however, argues that because of the fact that Andrew B. Petersen was the holder of seventy-nine shares of stock in the company, and because his individual interest in keeping the stations open was practically the same as that of the company, the court should have found that the company, not Andrew B. Petersen, was the licensee and that the company was in fact engaged in the business of selling gaso-

line. There are, in our opinion, no facts and no law to support that argument. At the time the license was issued to Andrew B. Petersen by the state treasurer, the company was in a rather hopeless financial condition. It had failed to pay large sums of money due the state and obviously, under the law, could not obtain a license. The state treasurer refused to license it. The state instituted an action against the company for the purpose of recovering the unpaid taxes due it and had a receiver of the company appointed. The state treasurer, after being fully informed of the whole situation, licensed Andrew B. Petersen and thereby authorized him, not the company, to engage as a dealer in gasoline. We find nothing in the proven facts which would permit any court to say that Andrew B. Petersen was a mere dummy, a licensee in name only, and that the business of selling gasoline was in fact conducted by the company. The mere fact that the company, in its answer to the state's cross-complaint, expressed its willingness to give the state a lien, is not controlling and in no way changes or alters the situation revealed by the undisputed facts. Just what motive prompted the company to consent that a lien for more than $13,000 be declared upon its property in favor of the state does not clearly appear. However, it would not be difficult to venture a guess as to its motive, if that were at all important, and if the consent given by the company had any controlling effect upon this controversy. Petersen was the licensee. He it was whom the state trusted, and he alone was obligated to pay the taxes to the state. The company in no way profited from the operation of the station by Andrew, except that it received rent from him and the station was kept open and its good-will in part preserved.

Although the company did not appeal from the judgment or any part thereof, it seeks, among other things, by its motion to review, (1) to have this court hold as to each of four of the liens, which concededly were assigned to the Rediskes

after filing and before judgment, that the right to a lien was waived because no notices in writing of such assignments, together with copies thereof, were served upon the company, the owner of the property affected, within fifteen days after such assignments were made, sec. 289.04, Stats.; *Shearer v. Browne,* 102 Wis. 585, 78 N. W. 744; and (2) to have this court determine that a certain other lien was not entitled to priority over the Rediske mortgages. Had the company seen fit to appeal from those parts of the judgment which it now seeks to have modified on its motion to review, the matters complained of would be before us. However, on this appeal by the state, the company may not, by motion to review, attack those parts of the judgment in which the state is in no way interested. Sec. 274.12, in part, provides:

"In any case the respondent may have a review of the rulings of which he complains, by serving upon the appellant any time before the case is set down for hearing in the supreme court, a notice stating in what respect he asks for a review, reversal or modification of any part of the judgment or order appealed from."

While in form the state appealed from all of the judgment, it obviously appealed only from that part of the judgment which denied to it a lien for unpaid gasoline taxes, penalties, etc. In *Lezala v. Jazek,* 170 Wis. 532, 175 N. W. 87, 176 N. W. 238, it was said, in reference to that part of sec. 274.12, just quoted:

"The purpose of the latter provision is plain. It is to enable a party who is adversely interested in an appeal, generally the respondent, to secure a review of alleged errors prejudicially affecting him, by the giving of this notice. It was not the purpose of the statute to authorize a review under circumstances here presented. Nor is such notice efficient to procure a reversal of the judgment in the absence of an appeal therefrom."

In our opinion a motion to review was never intended to serve as a substitute for an appeal in a case like this. The

company cannot be said to be adversely interested in the denial of the claim of the state for a lien. The purpose of a motion to review is to reverse or modify some part of a judgment asserted to be erroneous as to the respondent or to have this court consider some ruling made upon a trial, so that in case of a reversal of the judgment, that error, if error it be, may not again occur. Under the law, the motion to review was wholly ineffective to present the questions raised.

*By the Court.*—Judgment affirmed.